**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2039-17T3
                 A-4739-17T4

LAWRENCE B. SEIDMAN,

     Plaintiff-Respondent,

v.

SPENCER SAVINGS BANK,
SLA, JOSE B. GUERRERO,
PETER J. HAYES, NICHOLAS
LORUSSO, BARRY MINKIN,
JOHN STURGES, ANTHONY S.
CICATIELLO, and ALBERT D.
CHAMBERLAIN,

     Defendants-Appellants.

_____

LAWRENCE B. SEIDMAN,

     Plaintiff-Appellant,

v.

SPENCER SAVINGS BANK,
SLA, JOSE B. GUERRERO,
PETER J. HAYES, NICHOLAS
LORUSSO, BARRY MINKIN,
JOHN STURGES, ANTHONY S.

CICATIELLO, and ALBERT D. CHAMBERLAIN,

    Defendants-Respondents.
_____

                    Argued September 16, 2019 – Decided October 3, 2019

                    Before Judges Sabatino, Sumners, and Geiger.

                    On appeal from the Superior Court of New Jersey,
                    Chancery Division, Passaic County, Docket No. C-
                    000053-15.

                    Helen Davis Chaitman argued the cause for appellants
                    in A-2039-17 and respondents in A-4739-17 (Chaitman
                    LLP, attorneys; Helen Davis Chaitman, of counsel and
                    on the briefs; Gregory M. Dexter, on the briefs).

                    Peter R. Bray argued the cause for respondent in A-
                    2039-17 and appellant in A-4739-17 (Bray & Bray,
                    LLC, attorneys; Peter R. Bray, on the briefs).

                    Garen Gazaryan, Deputy Attorney General, argued the
                    cause for intervenor New Jersey Department of
                    Banking and Insurance (Gurbir S. Grewal, Attorney
                    General, attorney; Garen Gazaryan, on the brief).

PER CURIAM

    These appeals[1] represents the fifth time this court has been asked to

address this ongoing dispute between plaintiff Lawrence B. Seidman, an

_____
[1]  The appeals were argued back-to-back and we consolidate them for purposes
of this opinion.

attorney and money manager, and defendant Spencer Savings Bank, SLA ("Spencer" or "the bank"), a mutual savings and loan association established pursuant to the New Jersey Savings and Loan Act, N.J.S.A. 17:12B-1 to -319 (the "SLA").[2]

Seidman and several of his relatives have been depositors at the bank. He contends the bank's Board of Directors and Chief Executive Officer ("CEO") are entrenched, and they have mismanaged the bank and reaped excessive compensation and other perks. The bank contends, on the other hand, that it has been soundly managed, and that Seidman is improperly trying to wrest control of the bank for personal gain.

Through a by-law adopted in 1995, the bank established a ten-percent threshold of total depositors for nominating Board members. Seidman sued to

---

[2] See Seidman v. Spencer Sav. Bank, No. A-3899-04 (App. Div. March 23, 2006) ("Seidman I") (remanding certain issues respectively to the trial court and to the Commissioner of Banking and Insurance); Seidman v. Spencer Sav. Bank, Nos. A-0167-07, A-1036-07, A-1343-07 (App. Div. Nov. 9, 2009) ("Seidman II") (remanding certain issues to the Commissioner for amplification); Seidman v. Spencer Sav. Bank, Nos. A-0167-07, A-1036-07, A-1343-07 (App. Div. July 27, 2010) ("Seidman III") (affirming certain rulings by the trial court and the Commissioner, but allowing plaintiff to file a new complaint), certif. denied, 204 N.J. 42 (2010); Seidman v. Spencer Sav. Bank, No. A-3836-12 (App. Div. April 30, 2015) ("Seidman IV") (affirming the trial court's invalidation of the fifteen percent nominating threshold, but remanding for reconsideration of counsel fee award).

invalidate the threshold as too onerous, given the thousands of depositors at the bank.  In ensuing years, the bank attempted to raise the nominating threshold to twenty percent and then fifteen percent, both of which were judicially invalidated.  The ten-percent threshold was reinstated.

Following a bench trial, a Chancery judge invalidated the ten-percent threshold and replaced it with the nominating threshold used by federal credit unions, which is the lesser of one percent of the membership or 500 members.  The judge further ordered the bank to reinstate the accounts of Seidman and his family that it had closed during the litigation, and awarded Seidman counsel fees.

The bank appeals in A-2039-17 the trial court's findings. It argues that Seidman's present lawsuit is procedurally barred for various reasons, and, in any event, Seidman produced no empirical evidence showing that the ten-percent threshold is per se unreasonable.  The bank contends the threshold is protected by the business judgment rule, and that it acted within its rights in closing Seidman's accounts.  Finally, the bank argues that counsel fees were improperly awarded and that an evidentiary hearing was required to determine the reasonableness of the fee request.

The New Jersey Department of Banking and Insurance ("DOBI") has intervened in this appeal. Intervenor argues the Chancery court lacked authority under the SLA to unilaterally establish a nomination threshold without first obtaining the approval of the DOBI's Commissioner.

In his related appeal in A-4739-17, Seidman argues the trial court erred in declining to order the bank to reinstate the so-called "Wawel" accounts held by himself and persons affiliated with him.

For the reasons that follow, we affirm in part and vacate in part the trial court's orders.

I.

We presume the reader's familiarity with the factual background and procedural events that led to the hearings and judicial rulings that are the subject of this fifth appeal. For sake of brevity, we summarize those most recent hearings and the trial court's decisions.

1. The Ten-Percent Threshold

Seidman's evidence concerning the ten-percent threshold at the 2017 bench trial was almost identical to the evidence he presented at the earlier trials, when he challenged the twenty percent and fifteen percent thresholds. As in the earlier proceedings, Seidman called several members of the Board and upper-

level bank managers to testify concerning the bank's membership, the composition of the Board, and the voting procedures.

Seidman's evidence showed that the average Spencer depositor (known as a "member") is a blue collar individual, possibly a recent immigrant. Spencer does not possess computer software to tabulate the precise number of voting members, and for that reason it retains outside firms when a census of members is required. During trial, Spencer hired the stock brokerage firm of Raymond James to count the membership. According to the Raymond James report, as of June 16, 2017, the bank's membership was 57,749, with the number of eligible voters being 53,949.[3]

Spencer's Board consists of seven directors who receive a salary of $70,000 to $75,000 per year, a health insurance policy, and a retirement plan. In exchange for that compensation, the directors are required to attend twelve monthly meetings each year and serve on various committees.

Spencer's CEO and Board Chairman is Jose Guerrero, who has been unanimously elected by the directors each year since 2006. His annual salary is $880,000 with a bonus of $1.2 million. As the result of By-Law 9, which was

---

[3] The difference between these numbers is due to the fact that only one person can vote per account, and account holders below the age of sixteen are ineligible to vote.

A-2039-17T3

adopted in 2014, if Guerrero should fail to win re-election to the Board, an eighth director position must be created and Guerrero must be appointed to it. All of the directors currently on the Board were personally invited to join by Guerrero.

The directors of the bank are elected to three-year staggered terms. Elections are held at the annual meeting at the end of January, which is open to the entire membership. Although notices are published in newspapers, Spencer's website, and postings at the branch offices, only about 300 members usually attend the meeting. A member can vote in person or by proxy at the meeting, and can also mail in a vote in advance. By far, the majority of votes cast are the result of "running proxies,"[4] signed over to the Board by members when they open an account. In the 2017 election, approximately 6,700 members voted by proxy.

There are two paths to gaining a seat on the Board. In one path, the Board's nominating committee chooses a candidate, and once nominated that candidate is eligible to stand for election by the membership. A person selected by the nominating committee is not required to satisfy the ten-percent threshold.

---

[4] Seidman explained that in a running proxy, a member gives either certain Board members or the entire Board the right to vote their membership interest without checking with that member as to what he or she wants to do.

Because a quorum is defined as one person, a candidate can be voted onto the Board by a single vote margin. In the second path, an individual seeking nomination must obtain the support of ten-percent of the eligible voters. This ten-percent threshold only applies to outsiders who want a seat on the Board. No one has ever obtained a seat on the Board through the second path. In fact, other than Seidman, no outsider in the last fifty years has attempted to nominate a Spencer director.

Under the SLA, members' names are confidential and cannot be released to individuals who want to run for a Board seat. Rather, the individual seeking nomination must request that the bank send a letter to the membership on his or her behalf. The SLA requires that the individual pay the cost of mailing, which in Spencer's case would amount to approximately $50,000. See N.J.S.A. 17:12B-119 to -120.[5]

As we have noted, Spencer is a state-chartered savings and loan institution, subject to the oversight of both state and federal regulators. As a mutual institution, Spencer has a community focus and a close relationship to its customers. The directors believe that if the bank were converted to a stock

---

[5] We need not address here whether this mailing requirement is antiquated, which instead is a question for the Legislature or the Commissioner.

institution, its focus would change and its commitment to the community would disappear.

The directors expressed concern that if there were no nominating threshold, anyone could put his or her name up for nomination. According to the directors, the threshold requirement was established to avert chaos and prevent an unqualified person from being elected to the Board. Thus, when the directors adopted the ten-percent threshold in 1995 and subsequently raised it to twenty percent, their main concern was to keep Seidman and his group of professional investors from obtaining a seat on the Board.

Seidman testified that he is a licensed attorney who has been involved in the banking industry since 1983. He is a money manager whose business receives twenty percent of his clients' appreciation on investments. He has a controlling interest in several banks, due to not only investments of his personal funds but also investments made on behalf of his clients.

Seidman has served on the boards of eleven banks, but never on the board of a mutually owned institution. He explained that all of the banks with which he was involved had vetting procedures incorporated into their by-laws that required the submission of certain documentation, and sometimes even an interview, at least ninety days prior to the request to become a director. Spencer

has no analogous vetting procedures in its by-laws. Seidman stated that he knew of no other bank besides Spencer that had a nomination threshold.

Seidman opened his first account at Spencer in 1988. He contacted the bank's management in 2004 when he heard a rumor that the bank might be "going public." He wrote to Guerrero, and after receiving no response, he was able to reach him by phone. Seidman recalled that Guerrero was hostile and refused to answer questions.

Immediately after the phone call, Seidman wrote a letter attempting to nominate himself to the Board. On learning of the ten-percent nomination threshold, Seidman prepared a petition and sought signatures while standing on public property near defendant's branch offices. He claims that officers of the bank accosted him and told him to leave or they would call the police.

Seidman next submitted a letter to the Board, asking that it be mailed to the membership. That letter was rejected as deficient. Seidman explained that he did not pursue sending out another letter because he believed that it would be futile. From the date of the trial court's decision in 2012 reinstating the nomination threshold at ten-percent up through the time of the 2017 trial, Seidman made no effort to nominate anyone to a director's seat on the Board.

In its defense, Spencer presented expert testimony from Thomas Cronin,

A-2039-17T3

who had been involved in the banking industry for thirty-four years as a proxy solicitation specialist. Cronin stated that he had worked for and against Seidman in the past. He described Seidman's practice of gaining control of banks and converting them to stock companies. Cronin admitted that his experience with mutuals was limited and that he had never solicited votes for a director's seat on a mutual board. Cronin also admitted that conversion was not necessarily a bad thing and that an investor might potentially lose money by buying stock after a conversion.

Cronin maintained that the twenty-percent nomination threshold the bank had previously adopted had been reasonable. He believed that lowering the threshold below its present ten-percent level would be disruptive because, in light of Spencer's lack of vetting procedures, anyone could be nominated. Cronin stated that a nomination threshold of ten-percent was achievable.

John Sturges, who had served on the Board since 2007, testified that the SLA requires members who wish to communicate with other members to do so by mailings sent by the bank itself. The member who requests such a mailing must pay the cost himself or herself, and that cost would be the same regardless of the nomination threshold percentage. Thus, it would cost exactly the same to send out a mailing, regardless of whether the threshold was five percent or

11

fifteen percent, because a letter would still have to go to all of the members.

2. The Nomination Standard Used By Federal Credit Unions

Seidman presented expert testimony from Robert Fenner, who was employed for over thirty-five years as an attorney for the National Credit Union Administration ("NCUA"), the federal agency that oversees the credit union system.

Fenner stated that there are 5,275 federally insured credit unions in the United States, of which about two-thirds are federally chartered and operate under the standard by-laws promulgated by the NCUA. He explained that federal credit unions are member-owned cooperatives, not stock corporations. They operate in much the same way as a commercial bank but they don't have shareholders. Their boards of directors are elected by the membership on the basis of one member, one vote. These boards have a fiduciary duty to act only in the best interests of the members.

As a result, credit unions usually offer higher deposit rates and charge lower loan rates than commercial banks. The rates are lower, in fact, than those offered by mutual savings banks like Spencer. Federal credit unions range in size anywhere from 100,000 members, and a few thousand dollars in assets to

12

six million members and seventy-nine billion dollars in assets.[6]

Fenner testified the nomination process is the same in all federally chartered credit unions, regardless of their size. Every federal credit union must have a board of directors of no fewer than five and no more than fifteen members, who serve staggered two- or three-year terms. The election for director seats that are expiring occurs at an annual meeting, and the process is comparable to that at a mutual savings bank. The existing board establishes a nominating committee that nominates directors to fill the upcoming vacancies. In addition, seventy-five days before the annual meeting, the credit union is required to send notice to the members that they can nominate individuals by petition. Members have thirty days to gather the required number of signatures and submit a petition.

The NCUA by-laws set the number of required signatures as one percent of the membership, but no fewer than twenty and no greater than 500. Thus, for larger-sized credit unions, nomination by petition can be obtained with 500 signatures. The one-percent or 500-signature by-law has been in place for many years, and was recently reviewed in 2006. The threshold was retained on review

---

[6] For the sake of comparison, Spencer has approximately $3,000,000,000 (three billion dollars) in assets.

A-2039-17T3

because the NCUA felt that a higher number would make it too difficult for the average member to participate in the election process.

Under the Federal Credit Union Act ("FCUA"), 12 U.S.C. §§ 1751 to 1795k, members are not entitled to obtain a membership list or communicate with the entire membership. There are only three ways for members to obtain 500 signatures on a nomination petition: (1) stand outside of bank offices and collect signatures; (2) obtain signatures from family and friends; and (3) send emails to people they know and ask that those emails be passed along to others. Fenner believed that giving members access to a membership list and directing them to send a mailing would be meaningless to the average member. He cited the Navy Federal Credit Union as an example, where with six million members, an average member could not hope to comply with a mailing requirement.

Fenner stated that the petition process imposed by the NCUA by-law has been used successfully more than once, although he could not specifically recall how many times. He opined there is a great deal of comparability between a federal credit union and a mutual savings association. Both are member-owned and both are motivated to serve customers in the best possible way. Fenner admitted, however, that Spencer is regulated by the New Jersey DOBI and the FDIC, not by the FCUA. He also admitted that he is not an expert on New

14

Jersey's SLA.

Seidman presented no witness other than Fenner to support his request that the nomination threshold be reduced to one percent or 500 members. Seidman did testify, however, that if the less-onerous FCUA standard were adopted, he would return to public spaces outside of Spencer's branch offices and ask people to sign his petition. He would also contact family members and the brokerage community in an effort to collect signatures.

Spencer presented no expert witness to rebut Fenner's testimony, nor to discuss the regulatory differences between a mutual savings and loan association and a federal credit union.

3. The Closure of Seidman's Bank Accounts

Testimony concerning the closed bank accounts consumed much of the trial. Seidman questioned every director and bank officer about the decision to close his accounts. The bank defended its decision by presenting testimony concerning Seidman's allegedly illicit dealings in the banking industry.

The bank accounts in question were closed on April 20, 2016. Not only were Seidman's personal accounts closed, but so were accounts belonging to his wife, his daughter, and his son-in-law. Closed at a later date were the accounts of two entities affiliated with Seidman – Veteri Place Corporation and the Israeli

Sports Exchange. The bank also closed[7] the attorney accounts that Seidman's counsel had opened in Seidman's name pursuant to court order.

The directors testified that they first learned of these account closures after the fact, at the Board meeting in April 2016. They acknowledged that the Board has the ultimate authority to close accounts, but explained that they had delegated that authority to the bank's management. Nevertheless, several directors admitted that they strongly approved of the account closures. One director, Albert D. Chamberlain, stated that the goal in closing Seidman's accounts was to deprive him of his membership so that he could no longer initiate the nomination process.

Jane Rey, the bank's Chief Operating Officer and First Executive Vice-President, testified that she and Guerrero made the decision to close Seidman's accounts based on the recommendation of their attorney. She recalled that on April 15, 2016, she was called into a meeting with Guerrero and the attorney. The attorney provided Rey with a copy of Spencer's counterclaim, and they discussed closing the accounts. They also received advice from Spencer's regulatory counsel. The decision to close the accounts was made at that time.

---

[7] There is conflicting evidence in the record whether Spencer closed the attorney trust accounts or simply refused to open them.

Rey explained that one of the reasons for the closure decision was that Seidman had become a "disruption" to management. The litigation with Seidman by that point had been an ongoing "distraction" for over ten years. The bank had expended over three million dollars in legal fees battling Seidman, making his the most unprofitable accounts it ever had. In addition, Rey perceived Seidman is a "disreputable person" who orchestrates a group of out-of-state professional investors. Information about Seidman's apparent plan to take over the bank was first unearthed in 2008 and 2009, but Rey refrained from closing Seidman's accounts at that time because of the litigation. Rey likewise had wanted to close Seidman's accounts when the litigation first started in 2004, but the bank's regulatory counsel at the time advised her not to do so. By 2016, however, Rey felt "enough was enough."

Rey asserted that it has always been the case in the banking business that an account can be closed without giving a reason: "It happens routinely . . . . It's not a rare occurrence." She identified the 2012 "terms and conditions" booklet that defendant provided to new members. The booklet contained a provision that stated: "we may close your account at any time with or without cause." Rey also identified a 2009 "terms and conditions" booklet that contained the language: "we may close this account at any time upon reasonable notice to

you and tender the account balance personally or by mail." An identical provision was included in the 2003 "terms and conditions" booklet, and in every booklet dating back to 1993 when Rey started working at the bank. She admitted that the "with or without cause" language was added to the booklet in 2012, but insisted that the terms and conditions always allowed the bank to close an account without cause.

Rey stated that once an account is closed, that individual is no longer a member and would have no vote as to who should be on the Board. She further stated that the accounts of Seidman's relatives were closed solely because of their relationship to him.

Guerrero corroborated Rey's testimony on these subjects. Guerrero recalled that he met with Spencer's litigation counsel, Rey, and Graham Jones, the bank's general counsel, in April 2016. Litigation counsel had already consulted with Spencer's regulatory attorneys. It was recommended that Seidman's accounts be closed based on the racketeering ("civil RICO") counterclaim against him. The fact that the claim was later dismissed by the trial court did not change Guerrero's mind about the correctness of closing Seidman's accounts.

Jones testified that he has served as Spencer's general counsel for almost

fifty years. He regularly attends Board meetings and his firm does transactional and collection work for Spencer. He personally reviewed and approved the letter sent to Seidman on April 20, 2016, closing his accounts. Litigation counsel had advised Rey and Guerrero that as a result of Spencer filing a civil RICO claim against Seidman, Seidman's accounts needed to be closed as a matter of law. Jones agreed with that advice.

To further justify closing Seidman's accounts, Spencer attempted to introduce evidence of his disciplinary infractions, his supposed association with alleged criminals, and his predatory practices. These proffers were met with strong resistance from Seidman, and the trial court curtailed much of such testimony. The evidence that was admitted generally followed the allegations of the bank's affirmative defenses.

Rey testified that she became aware of Seidman's association with Mark Ristow while investigating accounts opened by out-of-state residents. Ristow opened accounts at the bank in the names of New Jersey residents, added himself as an account signatory, and then removed the New Jersey residents from the accounts. Ristow was subsequently indicted by the federal government, on unrelated grounds, for bank fraud. As to Seidman himself, Rey noted that he had been the subject of a cease and desist ordered issued by the Office of Thrift

Supervision ("OTS") in the 1990s, based on his actions as director of a federal savings and loan association.

Cronin testified that Seidman works with a group of "opportunistic" investors by opening accounts in savings and loans throughout the country so that if the institution converts to a stock corporation they can make money with little risk. First, Seidman's group purportedly would combine their voting interests in order to gain a seat on the board. Once on the board, Seidman would convince other directors to vote for a conversion and his group would reap the profits.

Spencer also called Neal Axelrod, Seidman's personal and business accountant, who testified about the Israeli Sports Exchange, a not-for-profit foundation organized under the Internal Revenue Code, 26 U.S.C. § 501(c)(3). Seidman is the president of the organization and Axelrod is its vice-president and accountant. While the stated goal of the Israeli Sports Exchange is to run an exchange program for American and Israeli teenagers, a secondary purpose is to open accounts at banks in order to take advantage of public offerings. Axelrod had no recollection of Seidman's dealings with Spencer, even though Seidman had at one time proposed nominating Axelrod to the Board.

A-2039-17T3

### 4. The Trial Judge's Decisions

Upon considering the proofs, the trial judge[8] issued a written opinion on October 19, 2018. In his opinion, the trial judge invalidated the ten-percent nomination threshold. Among other things, the judge noted that anyone seeking to achieve the nomination threshold through mailing must bear the cost of mailing a solicitation to all members. That mailing cost would exceed $50,000. The judge found "[t]he cost of this mailing places nomination beyond the reach of the average member." The judge also found that, given the size of the bank's membership, "it is clear . . . that the use of a static percentage nomination requirement is unworkable. The membership of Spencer fluctuates and cannot be determined with any degree of exactitude."

Additionally, the trial judge found that the bank's Board members have engaged in entrenching conduct. He found the Board functioned as "a self-perpetrating body of members," that "virtually all [Board] members have been invited to join the Board by Jose Guerrero," and that "[t]hey, in turn consistently reappoint Guerrero and approve his very lucrative compensation package. The judge also found it "quite clear that the [bank's] Directors are all beholden and

---

[8] We distinguish the Chancery judge who presided over the 2017 trial ("the trial judge") from the former Chancery judge who had presided over the case for most of its duration, until her retirement in June 2016.

A-2039-17T3

defer without exception to Jose Guerrero."

Continuing his findings on entrenchment, the trial judge also found "[t]he maintenance of a [ten-percent] nomination is entrenching." As the judge noted, "the motivating factors of establishing and maintaining this threshold is fear of [p]laintiff." The trial judge found it "clear that Board seeks to maintain total control of the governance of the Bank without challenge." The trial judge also found "there is clear evidence of entrenchment which leads to disenfranchisement."

The trial judge rejected Spencer's claim that the present ten-percent threshold ensures stability and prevents chaos, finding that claim "simply not supported by the evidence." Likewise, the judge rejected Spencer's argument that the threshold preserves mutuality. As he put it, the "goal of mutuality is too attenuated to be relevant. There is no evidence to conclude that conversion [of the bank to a stock form] is necessarily a bad thing except for some self-serving declarations, without substantiation, of Board Members and Spencer employees." For these many reasons, the judge struck down the ten-percent threshold.

As to a remedy, the trial judge was persuaded, largely by the credible "and arguably unrefuted" testimony of Seidman's expert Fenner, that the one-

percent/500-member threshold used by federal credit unions should be adopted here. By contrast, the judge found the testimony of Spencer's expert Cronin unpersuasive. Among other things, the judge found that Cronin's reasoning was "flawed," that Cronin admitted he "did not consider Spencer's membership size in his analysis," and that Cronin is "biased against [p]laintiff."

For these multiple reasons, the trial judge vacated the ten-percent threshold and replaced it with the one-percent/500-member threshold advocated by Fenner and Seidman. In doing so, the judge explicitly chose "not to leave the Directors to their own devices."

On the issue of the bank's closure of the accounts of Seidman and his associates, the trial judge found Spencer's reasons for those closures to be "pretextual" and "in bad faith." The judge found "none of the reasons given by Ms. Rey to support the closure of the accounts to be credible." The judge stressed that "there was no proof presented by the defense to suggest that Seidman did anything wrong or illegal." Moreover, none of the fourteen witnesses the bank called in an effort to discredit Seidman supported the bank's "theory that [Seidman's family members or associates] were engaged in some clandestine conspiracy" with him. Accordingly, the judge ordered "reinstatement of all subject accounts that were improperly closed."

As a final measure, the trial judge awarded partial counsel fees to Seidman for his successful prosecution of derivative claims that resulted in the court striking down the ten-percent threshold. The judge found those derivative claims "unquestionably" redounded to the benefit of Spencer and its members, as a matter of corporate governance. The judge did reject, as non-derivative, Seidman's counsel fees expended in the litigation of the closure of the accounts." The judge also rejected Seidman's request to remove the bank's directors, noting the court "will not now take such a severe, draconian step."

5. Post-Trial Events

Following the trial, the judge granted Seidman, over Spencer's opposition, an award of counsel fees and costs. The judge also granted Spencer's motion to stay its decision on the merits pending this appeal.

While the appeal was pending, in March 2018, Spencer acquired by merger another entity, Wawel Financial Services MHC ("Wawel"). The bank then closed Seidman's accounts that he and his son-in-law held at Wawel. Seidman thereafter brought an order to show cause in the Chancery court seeking the reinstatement of the Wawel account. The trial judge denied that application, citing a lack of jurisdiction because Spencer's appeal was already pending.

Although it is not germane to the present appeal, in February 2019 the

Board held a special meeting at which it voted to adopt a plan to convert Spencer from a New Jersey chartered mutual savings association to a New Jersey chartered mutual savings bank. Apparently, if such a conversion were implemented, that would alter the means of control of the bank. Seidman filed suit in the Chancery Division, which temporarily stayed the conversion measures.[9] Spencer sought emergent relief from this court, and leave to appeal which a panel of this court denied, and the new case was remanded to the trial court to proceed to a hearing on a preliminary injunction or a trial.[10]

As we noted at the outset, the Commissioner has intervened in Spencer's appeal to assert the Commissioner's authority to review and approve by-laws for banks regulated under the SLA. The Commissioner takes no position at this time on the merits, as to whether the one-percent/500-member threshold adopted by the trial court is appropriate. Moreover, the Commissioner declined to intervene in Seidman's cross-appeal concerning the Wawel accounts.

## II.

On appeal, Spencer raises these numerous points in its main brief:

---

[9] By this point, a third judge was assigned the matter, as the trial judge from 2017 had since retired.

[10] We were advised at oral argument that the hearing or trial in the conversion case has not yet occurred because of the pendency of motion practice.

POINT I The trial court erred in not dismissing Counts I and II as a precluded collateral attack

A. Counts I and II [of the complaint] are barred by the entire controversy doctrine

B. Counts I and II are barred by res judicata

C. Counts I and II are barred by collateral estoppel

POINT II The trial court lacked the power to invalidate the threshold and unilaterally impose a 1% threshold by judicial fiat

POINT III The threshold is protected by the business judgment rule

A. The trial court erred in invalidating the threshold based on director compensation and "entrenchment"

POINT IV The trial court erred in not dismissing Counts I and II after Seidman failed to introduce any empirical evidence

POINT V The trial court erred in holding that the law-of-the case doctrine established that a threshold that requires approximately 6,000 votes is invalid

A. [The previous Chancery judge's] comment that 6,000 votes was a "bad number" was not law-of-the-case

B. An interlocutory ruling cannot become final simply because a judge retires

C. A denial of a motion for interlocutory appeal is not res judicata

POINT VI Counts I And II were time-barred

A-2039-17T3

POINT VII The trial court erred in requiring Spencer to reinstate the Seidman Accounts

A. Spencer has the contractual right to close accounts with or without cause

B. The implied covenant cannot override express contractual terms

C. Spencer's motive for closing the Seidman Accounts is irrelevant and Spencer did not act in bad faith

D. Seidman cannot bring an action for breach of contract because he suffered no damages

POINT VIII The trial court erred in awarding attorneys' fees to Seidman because he conferred a benefit on no one but himself

POINT IX The trial court erred in awarding attorneys' fees and costs without an evidentiary hearing when the certification of services contained numerous deficiencies

POINT X The trial court erred in failing to dismiss Seidman's derivative lawsuit for failure to make demand

POINT XI The trial court should have required Seidman to post security

In his cross-appeal concerning the closure of the Wawel accounts, Seidman argues this point:

POINT I: THE REFUSAL TO REQUIRE THE REINSTATEMENT OF THE WAWEL ACCOUNTS WAS ERRONEOUS.

27

In reviewing these arguments in the wake of this extensive bench trial, we apply well-established general principles of appellate review. "Findings by a trial court are binding on appeal when supported by adequate, substantial, and credible evidence." Triffin v. Automatic Data Processing, Inc., 411 N.J. Super. 292, 305 (App. Div. 2010) (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974)). "[A]n appellate court should not disturb the 'factual findings and legal conclusions of the trial judge unless [it is] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Ibid. (quoting Rova Farms, 65 N.J. at 484) (alteration in original). See also Seidman v. Clifton Sav. Bank, 205 N.J. 150, 169 (2011) (same).

An appellate court gives particular deference to a trial judge's credibility determinations. In re Trust Created by Agreement, 194 N.J. 276, 284 (2008). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference," and are subject to de novo review. Manalapan Realty v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). We apply all of the principles of review here.

A.

Before we plunge into the merits, we can readily dispense with various procedural arguments presented by both parties.

First, we reject Spencer's argument that Seidman's complaint, the 2017 trial, and the court's findings concerning the validity of ten-percent threshold were all precluded by this court's prior disposition in Seidman IV. In that vein, Spencer invokes related principles of (1) entire controversy, see, e.g., Kent Motor Cars, Inc. v. Reynolds & Reynolds Co., 207 N.J. 428, 443 (2011); (2) res judicata, see, e.g., Velasquez v. Frank, 123 N.J. 498, 505 (1991); and (3) collateral estoppel, see, e.g., In re Dawson, 136 N.J. 1, 20 (1994). Specifically, Spencer contends that in Seidman IV we conclusively upheld the original ten-percent threshold that had been restored by the former Chancery judge, and thereby barred any future challenges by Seidman to that threshold. Not so.

The validity of the ten-percent threshold was never actually litigated before the 2017 trial. Spencer misconstrues the significance of the former Chancery judge's decision that was before us in Seidman IV. In essence, the trial court at that time, having nullified the amended by-law with a fifteen-percent threshold, simply reinstated the original ten-percent threshold. The merits of the ten-percent threshold were never fully explored with testimony and

29

other evidence until the 2017 trial. The facts and proofs concerning the ten-percent threshold concerned a different aspect of the parties' controversy.

Seidman could not have been reasonably expected to challenge a hypothetical ten-percent threshold in his earlier lawsuits where he was challenging the twenty and fifteen percent threshold. The successive claims were not amenable to be litigated comprehensively in one case. Hence, the general policy disfavoring piecemeal litigation, as expressed in Kent Motors and other cases, did not bar this new lawsuit based upon a different threshold target.

Likewise, res judicata does not apply because the present case arises out of new acts and occurrences. Cf. Watkins, 124 N.J. at 412. Similarly, collateral estoppel does not apply because the discrete issue of the validity of the ten-percent threshold was not "actually litigated" before the present case. Dawson, 136 N.J. at 20.

Next, we are unpersuaded by Spencer's claim that this case was barred by the doctrine of laches. There was no "unexplainable and inexcusable delay" by Seidman in not challenging sooner the ten-percent threshold until the present case. Fox v. Millman, 210 N.J. 401, 417 (2012) (citation omitted). As the trial judge rightly found, the time to challenge the ten-percent threshold is appropriately measured from the date that the court reinstated it in Seidman IV,

not from the date of its original adoption in 1995. Moreover, there is no indication that Spencer was misled or changed its position due to any delay in Seidman's challenge. Nw. Covenant Med. Ctr. v. Fishman, 167 N.J. 123, 141 (2001); see Fox, 210 N.J. at 418 (noting that passage of time in-and-of-itself is insufficient to establish laches).

Nor are we persuaded by Spencer's assertion that the trial judge misapplied "law of the case" principles in finding it unreasonable to expect a depositor to obtain approximately 6,000 signatures to nominate a slate of directors. Although the previous Chancery judge had made a similar observation, the trial judge here ultimately did not hinge his analysis solely on that facet of the case. In fact, the judge noted that the "constant flux" in Spencer's membership made a fixed percentage threshold problematic. In any event, the trial judge did not misapply his discretion in affording deference to the previous judge's assessment about the steep number of required signatures. Akthar v. JDN Props. at Florham Park, 439 N.J. Super. 391, 399-400 (App. Div. 2015) (noting a judge's "discretion to decline relitigation of any legal decision made earlier by an equal court in the same case").[11]

---

[11] We will not grant relief to Spencer on its newly-fashioned argument that Seidman was required under Rule 4:32-3 to make a demand upon the Board before filing this derivative action. That argument was not raised below, and

B.

We now turn to the merits. First, Spencer argues that the trial judge's invalidation of the ten-percent threshold must be overturned because the judge had insufficient evidence to support that determination. In particular, Spencer faults Seidman for not presenting empirical proof showing the threshold was unreasonable. Spencer further argues the judge improperly considered his findings of entrenchment and excessive director compensation as grounds to nullify the by-law. The bank also contends the court's nullification of the threshold violates the business judgment doctrine.

Having fully considered these and other related criticisms of the judge's ruling on nullification, we reject them. Instead, we affirm the nullification of the ten-percent threshold substantially for the cogent and well-supported reasons expressed in the trial judge's October 19, 2017 opinion. A few additional comments are in order.

1.

We need not repeat here the many principles of corporate governance and the operation and regulation of mutual savings and loan associations that we

---

we decline to consider it. <u>Nieder v. Royal Indem. Ins. Co.</u>, 62 N.J. 229, 234 (1973).

expressed at length in our four previous opinions in <u>Seidman I</u>, <u>Seidman II</u>, <u>Seidman III</u>, and <u>Seidman IV</u>. We are satisfied the trial judge properly adhered to those principles in determining that the ten-percent threshold was too onerous and unreasonable. Moreover, the judge had ample testimony and other evidence to support his determination.

The trial judge's articulation of his findings on the threshold issue demonstrates the falsity of Spencer's claim that there was not a "shred of evidence" to support the court's invalidation of the ten-percent threshold. There was, in fact, substantial evidence to support the court's action.

Whether the nomination threshold requires, say, 10,000 signatures, 6,000 signatures, or 3,000 signatures is of little import. Once the number of required signatures becomes so large as to make it unachievable by petitioning members at branch offices or organizing a word-of-mouth campaign among family and friends, the exact number of needed signatures is irrelevant. As the trial judge noted, if a mailing approach is pursued, a mailing must be sent to <u>all</u> members, at a cost that would put a nomination well beyond the means of the average member.[12]

---

[12] We are unconvinced by Spencer's suggestion at oral argument on appeal that Seidman or some other depositor wishing to challenge the Board could realistically amass enough signatures through a Facebook posting or some other

Balanced against the disenfranchisement such a barrier would create are the Board's proffered reasons for the threshold, which centered on the Board's disdain for Seidman and fear that he might force Spencer to convert to a stock company. Yet, as the trial judge observed, conversion of a mutual savings and loan association is not necessarily a bad thing. Even if it were, numerous hurdles – some quite burdensome – would have to be overcome before it could come to pass.

In sum, the trial judge's conclusion that there are no legitimate reasons to overcome the proven negative impact of the ten-percent threshold was supported by adequate, substantial, and credible evidence.

2.

Furthermore, the "business judgment" doctrine was by no means trampled by the trial judge's decision. As we previously noted in Seidman IV, two of the critical elements of the doctrine are that the Board members must act in "good faith" and make a "reasonable" decision. Seidman IV, slip op. at 31 (citing In re PSE&G Shareholder Litigation, 173 N.J. 258, 286 (2002)).

---

social media initiative. We doubt that many depositors would be drawn in by a website that concerns their bank's management and control and take the time and effort to read and act upon its contents.

The trial judge's factual findings that the Board members in this case acted in bad faith towards Seidman and were unreasonable in maintaining the ten-percent threshold are unassailable. Spencer produced no evidence the directors were independent and disinterested. Counterproof abounded that they were not. As just one example, the adoption of By-Law 9 – which essentially assures Guerrero a seat on the Board in perpetuity – strongly supports the judge's conclusion that the directors are beholden to Guerrero. We are mindful the composition of the Board changed somewhat over the years, but those changes of directors did not undermine the trial judge's finding of continued and collective loyalty to the CEO.

## C.

We next consider Spencer's contention – which essentially is joined by the Commissioner as intervenor – that the trial judge erroneously imposed the one-percent/500-member alternative nomination standard without the Commissioner's approval. We concur on that process-related point. With all due deference to the judge, his imposition of an alternative threshold modeled after federal credit union practices was premature. The Commissioner needs to act first before such a remedy is implemented.

The applicable law reflects that a mutual savings and loan association may

A-2039-17T3

adopt such by-laws "as it may deem necessary or desirable for the regulation of its business and affairs and for the attainment of its purposes, consistent with the provisions of [the SLA] . . . and may change the same from time to time." N.J.S.A. 17:12B-38. In order to become effective, a by-law must be submitted in writing to the Commissioner for approval. N.J.S.A. 17:12B-39. "Approval shall not be withheld by the [C]ommissioner unless a proposed by-law or any change in the by-laws is in conflict with the provisions of [the SLA]." Ibid.

By imposing the threshold employed by federal credit unions without the Commissioner's approval, the trial court bypassed this statutory scheme. As we explained in Seidman III, slip op. at 26-27, nomination thresholds in-and-of-themselves do not conflict with the SLA. Seidman IV, slip op. at 29. The main problem with the ten-percent threshold here is not with the concept of a threshold itself, but rather with how Spencer's size had affected the application of that numerical threshold to the membership.

Another important consideration is the differences between a federal credit union and a state mutual savings and loan association. Hence, the application of the Commissioner's expertise in banking and banking regulation is critical and necessary. Seidman's expert Fenner testified concerning the institutions' similarities, but did not discuss their differences. Given that such

36

entities are governed by different statutory schemes, there may be a reason that the one-percent/500-signature standard works well for federal credit unions, but might not be appropriate for state mutuals. We do not intend, however, to forecast what the Commissioner might do.

In light of the tortuous history of this matter and the Board's clear hostility to Seidman, we appreciate why the trial judge chose "not to leave the Directors to their own devices." The judge exercised, in a creative fashion, his equitable authority as a Chancery judge in adopting the alternative threshold proposed by Seidman's expert. That was the only alternative option presented to him to replace the invalidated ten-percent.

The Board has already whiffed three times in setting the nomination threshold. It was not unreasonable for the trial judge to expect a fourth attempt by the Board would produce yet another insurmountable barrier. The judge did not abuse his broad equitable authority in attempting to devise a new threshold, in light of this unique and repetitive history and his well-supported findings of the Board's entrenching conduct and persisting bad faith. See Brenner v. Berkowitz, 134 N.J. 488, 514 (1993) (recognizing the court's broad "discretion to fashion equitable remedies" in appropriate circumstances); see also Sears v. Camp, 124 N.J. Eq. 403, 411-12 (E. & A. 1938) (similarly recognizing a "court

of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties").

Given the acrimony and contentiousness of this long-running litigation, it would have been futile to expect the Board to adopt a by-law with the credit union threshold advocated by Seidman and his expert. But the court did not have the authority to order the new threshold without first obtaining the Commissioner's blessing.

In fairness to the trial judge, the DOBI was presumably aware of this ongoing battle for control between Seidman and Spencer, but did not attempt to intervene in the litigation at the trial level. It was not until this appeal when the Commissioner moved to intervene. That said, the Commissioner as regulator must now be afforded the opportunity to evaluate the new threshold before it can become effective.

We do not in this opinion evaluate the merits of the alternative one-percent/500-member threshold, and instead await the Commissioner's assessment of that provision. We request the Commissioner to render that decision within ninety days, unless the Commissioner needs to extend that time further with the mutual consent of the parties. In the meantime, the stay of the

trial court's imposition of the new threshold shall remain in place until the Commissioner acts.

If, hypothetically, the Commissioner upholds the threshold, then Spencer may file a timely appeal of that final agency decision. Spencer also may move to reopen the present appeal, solely as to the one-percent/500-member issue, and consolidate those matters. If, on the other hand, the Commissioner disapproves of the new threshold, then Seidman may appeal that final agency decision to this court.

D.

We need not comment much about the issues in the appeal and cross-appeal pertaining to Spencer's closure of the bank accounts of Seidman and his family members and his associates. The trial judge articulated sound reasons for undoing Spencer's closure of the accounts, and we adopt them here. The judge's findings of bad faith and entrenching conduct amply justify the reinstatement of the accounts.

As a matter of law, the bank's contractual relationship with its depositors, including Seidman and his associates, is subject to an implied covenant of good faith and fair dealing. Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420 (1997). "The obligation to perform in good faith exists in every contract,

including those contracts that contain express and unambiguous provisions permitting either party to terminate the contract without cause." Id. at 421. That obligation was not honored in this case.

The same reasoning applies to the Wawel accounts, which also must be restored. Seidman's cross-appeal for relief on that limited issue must therefore be granted.

E.

Lastly, we discern no reason to disturb the trial court's award of counsel fees. In general, we afford substantial deference on appeal to fee determinations of a trial judge. Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001).

The trial judge here manifestly had a substantial "feel for the case," and was in an optimal position to evaluate the reasonableness of Seidman's fee claim. No evidentiary hearing was required.

Although the judge's written discussion of the fee claim could have been fuller, it explicitly recognized the fee-shifting factors in RPC 1.5, and it considered detailed competing submissions of the parties. A remand for a deeper analysis of the fee dispute is likely to generate even more litigation expenses for both sides.

Given the distinctive circumstances of this case, we are unpersuaded that

the fee award must be set aside, or that the amount awarded – in light of the fierce tenor of this marathon litigation – is manifestly unreasonable.

Nor does much need to be said about Spencer's argument that the trial court erred in declining to require Seidman to post a bond pending appeal. The bonding requirement in N.J.S.A. 14A:3-6.8 does not apply here because Spencer is not a New Jersey general business association. In addition, no court rule mandates the posting of security in the context of this case.

F.

To the extent we have not already discussed them explicitly, any other arguments and sub-arguments presented by the parties lack sufficient merit or relevance to be discussed in this opinion. R. 2:11-3(e)(1)(E).

Affirmed in part as to the invalidation of the ten-percent threshold, the order to reinstate Seidman's bank accounts and those of his relatives and associates, the award of counsel fees, and the denial of the application to require Seidman to post a security deposit.

Vacated in part, subject to the Commissioner's forthcoming review, as to the adoption of the one-percent/500-member nomination threshold.

We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2039-17T3